# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

KREUGER INTERNATIONAL, INC.,

        Plaintiff,

      v.                                    Case No. 07-C-0736

FEDERAL INSURANCE COMPANY and
ST. PAUL FIRE AND MARINE INSURANCE
COMPANY,

        Defendants.

---

## DECISION AND ORDER

---

Plaintiff Krueger International, Inc. ("KI") filed this lawsuit seeking declaratory relief against two of its former liability insurers. KI seeks a determination that Defendants St. Paul Fire and Marine Insurance Company ("St. Paul") and Federal Insurance Company ("Federal") had a duty under their respective policies to defend KI in an action filed against it by Studio & Partners s.r.l. ("S&P"), in which S&P alleged that KI had misappropriated S&P's furniture design ("the Underlying Action").[1] KI contends that S&P's complaint in the underlying action alleged that S&P sustained "advertising injury" as that term is defined in the insurer's respective policies. St. Paul and Federal, in turn, deny that S&P's complaint alleged any advertising injury, and further contend that any such claim falls within the explicit exclusions of their policies. In addition, St. Paul has

---

[1] The Underlying Action was dismissed on November 7, 2007. *Studio & Partners v. KI*, No. 06-C-0628, 2007 WL 3342597 (E.D. Wis.).

asserted a counterclaim against KI in which it seeks reimbursement of contributions it made toward KI's defense under a reservation of rights.

This Court's jurisdiction arises under 28 U.S.C. § 1332, and the case is now before me on cross motions for summary judgment. For the reasons stated herein, I conclude that none of the damages claimed by S&P in the Underlying Action fall within the coverage provided by the insurance policies. It follows that neither St. Paul, nor Federal, had a duty to defend. Their motions for summary judgment will therefore be granted, and KI's motion will be denied. I also conclude that St. Paul may be entitled to reimbursement of the defense costs it paid under its reservation of rights. That claim cannot be resolved on the record as it now stands, however, and so the case will be set for further proceedings. St. Paul's motion for leave to file an amended counterclaim which seeks to add to its claim for reimbursement the amount it paid in settlement of S&P's claim will also be granted. KI's motion to add a bad faith claim against St. Paul will be denied.

**BACKGROUND**

**I.  The Underlying Action**

Plaintiff KI is a Wisconsin corporation engaged in the business of manufacturing furniture. (St. Paul's PFOF ¶ 1.) The facts of the Underlying Action are more fully set forth in the Court's decision dismissing that case, *Studio & Partners v. KI*, No. 06-C-0628, 2007 WL 3342597 (E.D. Wis., Nov. 7, 2007.). In brief, S&P, an Italian company that designs furniture, brought suit against KI, alleging that KI had misappropriated S&P's designs for academic-style furniture, which S&P had designated its "CAMPUS" line, and then concealed that fact from S&P, the U.S. Patent and Trademark Office, and the public once KI began selling its own version of the furniture in the

2

American market. Between 1995 and 1998, KI's German subsidiary and S&P's predecessor had worked together in an attempt to bring the CAMPUS product to market. KI later informed S&P that it was no longer interested in going forward with the design. S&P claimed, however, that KI nevertheless went ahead and manufactured its own line of furniture, first called "Einstein" then "Intellect," based on S&P's designs. In 2003, KI applied for and received patents on an Einstein/Intellect desk and chair. According to S&P, it did not discover KI's alleged misappropriation and misconduct until 2005. In the Underlying Action, S&P asserted six separate claims for relief: (1) fraudulent concealment, (2) breach of fiduciary duty, (3) correction of patent inventorship, (4) misappropriation, (5) unjust enrichment, and (6) "misrepresentation/fraud/ negligent/strict liability."[2]

Asserting that S&P's allegations fell within the advertising injury coverage of both policies, KI tendered to each its defense. Federal rejected KI's tender on the ground that S&P had not alleged advertising injury and, in any event, S&P's claims fell within several policy exclusions, including the intellectual property exclusion. (Federal's PFOF ¶ 62.) Federal reaffirmed its rejection of KI's tender of defense on the same grounds after S&P filed an amended complaint. (*Id*. ¶ 63.) St. Paul initially took the same position and likewise rejected KI's tender of defense. (KI's PFOF ¶ 49.) St. Paul later reconsidered, however, and on August 16, 2007, it assumed KI's defense under a reservation of rights pending a coverage determination by the Court. (Van Severen Decl., April 1, 2008, Ex. I.) In its letter agreeing to defend KI under a reservation of rights, St. Paul expressly

---

[2] S&P filed an amended complaint on January 30, 2007, in which it titled its six claims as set forth above. In S&P's original complaint filed May 26, 2006, the claims were enumerated as "fraud," "breach of fiduciary duty," "correction of patent inventorship," "misappropriate," "unjust enrichment," and "misrepresentation/fraud." (KI's PFOF ¶ 3.)

3

noted that it was reserving its rights to seek reimbursement from KI for any amount it has paid in defending the case. (Van Severen Decl., April 1, 2008, Ex. I.)

The Underlying Action was ultimately dismissed on KI's motion for summary judgment in a decision entered on November 7, 2007. (Case No. 06-C-628, doc. # 358.) S&P thereafter appealed to the Court of Appeals for the Federal Circuit. While the appeal was pending, St. Paul settled the claim by paying S&P $315,000. ( Amended Counterclaim ¶ 13.) Based on the settlement reached by the parties, the appeal was dismissed on September 18, 2008. (Case No. 06-C- 628, doc. # 388.)

## II. The Insurance Policies

From April 1, 1994 through July 1, 2001, St. Paul issued a series of General Commercial Liability ("GCL") insurance policies to KI. (KI's PFOF ¶ 1.) Federal also issued KI a series of GCL insurance policies, which provided coverage during the span of July 1, 2001 through July 1, 2008. (*Id.* ¶ 2.)

### A. St. Paul's Policies

The advertising injury provisions of the policies issued to KI by St. Paul provided in relevant part:

> **Advertising injury liability**. We'll pay amounts any protected person is legally required to pay as damages for covered advertising injury that:
> • results from the advertising of your products, work or completed work; and
> • is caused by an advertising injury offense committed while this agreement is in effect.
>
> ***

4

*Advertising injury* means injury, other than bodily injury or personal injury, caused by an advertising injury offense.

*Advertising injury offense* means any of the following offenses:
•     Libel or slander.
•     Making known to any person or organization written or spoken material that belittles the products, work or completed work of others.
•     Making known to any person or organization written or spoken material that violates an individual's right of privacy.
•     Unauthorized taking or use of any advertising idea, material, slogan, style or title of others.

*Advertising* means attracting the attention of others by any means for the purpose of seeking customers or increasing sales or business.

(KI's PFOF ¶¶ 30, 33.)[3]

The St. Paul policies in effect from 1998-2001 also contained in intellectual property exclusion, which provided:

**Intellectual property**. We won't cover injury or damage that results from any actual or alleged infringement or violation of any of the following rights or laws:
•     Copyright.
•     Patents.
•     Trade dress.
•     Trade name.
•     Trade secret.
•     Trademark.
•     Other intellectual property rights or laws.

But we won't apply this exclusion to:
•     bodily injury or property damage that results from your products or completed work; or

---

[3] The policy language above (effective July 1994 to July 1997) was modified slightly in 1997, such that definition of advertising injury offense in the policies in effect from July 1997 to July 2001 includes the "[u]nauthorized taking or use of any advertising idea, material, slogan, style or title of others *in your advertising*." (See e.g. Joint Submission and Stipulation of Facts, Ex. I.G, KI 0398) (emphasis added). Because all of St. Paul's policies extended advertising injury coverage only to liability arising from the advertising of the insured's products, work or completed work, the change is immaterial to the Court's analysis.

5

•    advertising injury that results from the unauthorized use of any copyrighted or trademarked advertising material, slogan, style, or title of others in your advertising.

(St. Paul's PFOF ¶ 23.)  In addition, the policies provided for a limitation of coverage of claims arising out of "your [the insured's] completed work," defining "your work" as either "work that you're performing or others are performing for you; or service that you're providing or others are providing for you."  (KI's PFOF ¶ 33.)


**B.  Federal's Policies**

The policies issued to KI by Federal also provided "advertising injury" coverage.  The July 1, 2001 to July 1, 2003 policies defined "advertising" as "any advertisement, publicity article, broadcast or telecast," (Federal's PFOF ¶ 4) and "advertising injury" as follows:

**Advertising injury** means injury, other than **bodily injury** or **personal injury** arising solely out of one or more of the following offenses committed in the course of **advertising** of your goods, products or services:

•    oral or written publication of advertising material that slanders or libels a person or organization;
•    oral or written publication of advertising material that violates a person's right of privacy; or
•    infringement of copyrighted advertising materials or infringement of trademarked or service marked titles or slogans.

(Federal's PFOF ¶ 3.)  These policies contained the following intellectual property exclusion:

This insurance does not apply to **bodily injury, property damage, advertising injury** or **personal injury** arising out of or directly or indirectly related to the actual or alleged publication or utterances of oral or written statements, whether made in **advertising** or otherwise, which is claimed as infringement, violation or defense of any of the following rights or laws:

•    copyright, other than infringement of copyrighted advertising materials;
•    patent

6

- trade dress;
- trade secrets; or
- trademark or service mark or certification mark or collective mark or trade name, other than trademarked or service marked titles or slogans.

(Federal's PFOF ¶ 5.)

The policies issued to KI by Federal from July 1, 2003 to July 1, 2008 defined advertising injury as follows:

**Advertising injury** means injury, other than **bodily injury**, **property damage** or **personal injury**, sustained by a person or organization and caused by an offense of infringing, in that particular part of your **advertisement** about your goods, products or services, upon their:

- copyrighted **advertisement**; or
- registered collective mark, registered service mark or other registered trademarked name, slogan, symbol or title.

(Federal's PFOF ¶ 7.) Federal's policies defined "advertisement" as:

**Advertisement** means an electronic, oral, written or other notice, about goods, products or services, designed for the specific purpose of attracting the general public or a specific market segment to use such goods, products or services. **Advertisement** does not include any e-mail address, Internet domain name or other electronic address or metalanguage.

(*Id.* ¶ 8.) The policies contained the following intellectual property exclusion:

This insurance does not apply to any actual or alleged **bodily injury**, **property damage, advertising injury** or **personal injury** arising out of, giving rise to or in any way related to any actual or alleged:
- assertion; or
- infringement or violation;

by any person or organization (included any **insured**) of any **intellectual property law or right**, regardless of whether this insurance would otherwise apply to all or part of any such actual or alleged injury or damage in the absence of any such actual or alleged assertion, infringement or violation.
This exclusion applies, unless such injury:
- is caused by an offense described in the definition of **advertising injury**; and

7

- does not arise out of, give rise to or in any way relate to any actual or alleged assertion, infringement or violation of any **intellectual property law or right**, other than one described in the definition of **advertising injury**.

(Id. ¶ 9.)


## ANALYSIS

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Celotex*, 477 U.S. at 323. Where the party seeking summary judgment does not bear the burden of proof at trial on any element of the claim, it is enough that it inform the court of "the basis of its motion and identif[y] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id*. There is no requirement that a moving party who does not bear the burden of proof establish that the element does not exist. In other words, a moving party who does not have the burden of proof at trial (usually the defendant) is not required to prove a negative in order to make a prima facie showing for summary judgment. *Id*.

Once the moving party has met its burden, the nonmoving party must designate specific facts to support or defend each element of the cause of action, showing that there is a genuine issue for trial. *Id*. at 322-24. In analyzing whether a question of fact exists, the Court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc*., 477

8

U.S. 242, 255 (1986). The mere existence of some factual dispute does not defeat a summary judgment motion, however; there must be a genuine issue of material fact for the case to survive. *Id*. at 247-48.

## I. Duty to Defend

The parties dispute whether S&P alleged "advertising injury" in the Underlying Action, such that the insurer Defendants were required to provide KI a defense. Under Wisconsin law, "an insurer's duty to defend is predicated on the allegations in the complaint." *Delta Group, Inc. v. DBI, Inc.*, 204 Wis. 2d 515, 522, 555 N.W.2d 162, 165 (Ct. App. 1996) (citing *Elliott v. Donahue*, 169 Wis. 2d 310, 320-21, 485 N.W.2d 403, 407 (1992)).[4] "The insurer has a duty to defend whenever the allegations in the complaint, if proven, create a possibility of recovery that falls under the terms and conditions of the insurance policy." *Employers Mut. Cas. Co. v. Horace Mann Ins. Co.,* 2005 WI App 237 at ¶ 6, 287 Wis. 2d 418, 707 N.W.2d 280; *see also School Dist. of Shorewood v. Wausau Ins. Co.*, 170 Wis. 2d 347, 364, 488 N.W.2d 82, 87 (1992), *limited on other grounds in Johnson Controls, Inc. v. Employers Ins. of Wausau*, 2003 WI 108, 264 Wis. 2d 60, 665 N.W.2d 257 (2003). Thus, "[t]he duty to defend is triggered by the allegations contained within the four corners of the complaint." *Newhouse by Skow v. Citizens Sec. Mut. Ins. Co.*, 176 Wis. 2d 824, 835, 501 N.W.2d 1, 5 (1993); *see also Doyle v. Engelke*, 219 Wis. 2d 277, 284-85, 580 N.W.2d 245, 248 (1998) ("In determining an insurer's duty to defend, we apply the factual allegations present

---

[4] All parties acknowledge that Wisconsin law applies in this case, since the Court's jurisdiction is based on the diversity of the parties. *See State Farm Mut. Auto. Ins. Co. v. Pate*, 275 F.3d 666, 669 (7th Cir. 2001) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)).

9

in the complaint to the terms of the disputed insurance policy."); *Employers Mut. Cas. Co.*, 2005 WI App 237 at ¶ 6 (same).

"The test is whether the complaint arguably asserts a form of liability covered by the policy." *Hamlin Inc. v. Hartford Accident & Indem. Co.*, 86 F.3d 93, 96 (7th Cir. 1996) (applying Wisconsin law); *see Fireman's Fund Ins. Co. of Wis. v. Bradley Corp.*, 2003 WI 33, ¶ 20, 261 Wis. 2d 4, 660 N.W.2d 666 ("The duty to defend is necessarily broader than the duty to indemnify because the duty to defend is triggered by arguable, as opposed to actual, coverage."). In other words, a duty to defend will arise where the insured is able to offer "a plausible interpretation of the complaint that would bring its allegations within the scope of the liabilities" insured against. *Hamlin*, 86 F.3d at 96. "The duty of defense depends on the nature of the claim, not the merits, and any doubts must be resolved in favor of the insured." *Delta Group, Inc.*, 555 N.W.2d at 165 (citing *Elliott*, 485 N.W.2d at 407).

Here, KI contends that the Defendants had a duty to defend KI in the Underlying Action because S&P's allegations fell within the policies' definitions of "advertising injury." Under Wisconsin law, "if any part of the suit would if successful require the insurance company to indemnify the insured for 'advertising injury,' the insurance company [is] obligated to defend against the entire suit." *Curtis-Universal, Inc. v. Sheboygan Emergency Medical Services, Inc.*, 43 F.3d 1119, 1122 (7th Cir. 1994) (citing *School District of Shorewood*, 170 Wis. 2d at 366, 488 N.W.2d at 88). Furthermore,

> The insurer's obligations are not circumscribed by the plaintiff's choice of legal theories. The plaintiff's complaint, upon which the insurer's duty depends, need not even set forth the plaintiff's legal theories. *See, e.g.*, Fed. R. Civ. P. 8(a); Fed. R. Civ. P. Form 9. What is important is not the legal label that the plaintiff attaches to the defendant's (that is, the insured's) conduct, but whether that conduct as alleged

in the complaint is at least arguably within one or more of the categories of wrongdoing that the policy covers.

*Curtis-Universal, Inc.*, 43 F.3d at 1122.  Of course, the duty to defend is not unlimited; it arises based upon what has actually been alleged, not what may have been alleged.

> Modern pleading rules permit a plaintiff to expand the theory of his complaint . . . . But until the plaintiff takes advantage of this opportunity, an insurer need not leap to the defense. Otherwise every complaint would activate every one of the defendant's insurance policies—for it is always possible that the plaintiff will elaborate its theory in a way that comes within a policy.  Neither Wisconsin nor Illinois follows such an anything-goes approach. *See School District of Shorewood v. Wausau Insurance Cos.*, 170 Wis. 2d 347, 488 N.W.2d 82 (1992); *Transcontinental Insurance Co. v. National Union Fire Insurance Co.*, 278 Ill. App. 3d 357, 214 Ill. Dec. 934, 662 N.E.2d 500 (1st Dist. 1996).  A complaint need not use magic words, but it must sketch a claim that is within the scope of the policy.

*Western States Ins. Co. v. Wisconsin Wholesale Tire, Inc.*, 184 F.3d 699, 701-702 (7th Cir. 1999).

Wisconsin has developed a three-part test to determine whether a claim may give rise to advertising injury coverage.  First, "[t]he touchstone for determining whether [an underlying] complaint has alleged an advertising injury is the enumerated offenses in the insurance policy. Only those risks are insured, no others." *Fireman's Fund*, 2003 WI 33 at ¶ 27.  Second, the complaint must allege that the insured engaged in advertising activity.  *Id*. at ¶ 26.  Third, the complaint must allege a causal connection between the injury alleged and the insured's advertising activity.  *Id*.

### A.  Advertising Injury Coverage Under St. Paul's Policies

KI claims that S&P's allegations that KI displayed and misappropriated S&P's CAMPUS furniture design fall within one of the enumerated advertising injury offenses in St. Paul's policies. Specifically, KI contends that S&P's amended complaint alleges injury arising out of the "[u]nauthorized taking or use of any advertising idea, material, slogan, style or title of others."  (*Id*.

11

at 19 (quoting KI PFOF ¶ 30).) Before proceeding further, it will be helpful to focus in more detail on the precise words of this provision in order to determine exactly what offense is covered.

In interpreting insurance policies, Wisconsin courts follow general principles of contract construction. *Marotz v. Hallman*, 2007 WI 89,¶ 34, 302 Wis. 2d 428, 734 N.W.2d 411. The objective is to discern and give effect to the intent of the parties. *Sprangers v. Greatway Ins. Co.*, 182 Wis.2d 521, 536, 514 N.W.2d 1 (1994). "Toward that end, courts give the common, ordinary meaning to the policy language (i.e., what the reasonable person in the insured's position would understand them to mean)." *Marotz*, at ¶ 34. Ambiguities in the language of the policy, defined as provisions that are reasonably susceptible to more than one interpretation, are construed in favor of the insured. *Id.* This means that while ambiguous coverage provisions are construed broadly in favor of coverage, ambiguities in exclusions are construed narrowly against the insured. *Id.* Where, however, the language of the policy is plain and unambiguous, it should be enforced as written, without resort to rules of construction or principles in case law. *Danbeck v. American Family Mut. Ins. Co.*, 2001 WI 91, ¶ 10, 245 Wis.2d 186, 629 N.W.2d 150. Where its meaning is clear, the policy must not be "rewritten by construction to bind an insurer to a risk it never contemplated or was unwilling to cover, and for which it was never paid." *Gonzalez v. City of Franklin*, 137 Wis.2d 109, 122, 403 N.W.2d 747 (1987).

Here, the plain language of the pertinent provision requires that St. Paul pay damages resulting from KI's advertising of its products that arise from misappropriating someone else's advertising. The word "advertising," as used in this provision of the policy, is intended to modify not just "idea," but each of the terms that follow. Otherwise, the enumerated offense would extend far beyond the area of advertising. Thus, St. Paul agreed to indemnify KI against liability for

12

damages incurred where, in advertising its own products, KI misappropriated an idea, material, slogan, style or title from the advertising of another. In the context of this case, St. Paul would be required to indemnify KI for any damages KI incurred in advertising its own products if KI was found to have taken or used any of S&P's advertising ideas, materials, slogans, styles or titles without S&P's consent. Since S&P's lawsuit had nothing to do with its own advertising but was instead all about KI's alleged theft of its furniture design, it seems clear that no covered claim was alleged.

In KI's view, however, S&P alleged KI had committed an advertising injury offense in two ways. First, KI asserts, "S&P's allegations that KI took and improperly displayed CAMPUS in the KI showroom implicates coverage under the advertising *materials* language of the policy." (KI's Br. Supp. Mot. Summ. J. 25.) Second and more generally, KI contends that "the aesthetic nature of [S&P's] design is the true advertising idea and style because it was designed to appeal to consumers through unique appearance," (KI. Br. Opp'n St. Paul's Mot. Summ. J. 9, n.5) such that KI's alleged misappropriation and use of S&P's furniture design itself was an advertising injury. (KI's Br. Supp. Mot. Summ J. 25.)[5]  Though superficially attractive, KI's argument is ultimately unpersuasive.

_____

[5] KI also notes that attached to S&P's Amended Complaint as Exhibit Q are letters from S&P to K&I, one of which requests that S&P return to KI "all PR material, photos," and "manufacturing drafts concerning the CAMPUS product line." (KI's Br. Supp. Mot. Summ. J. 19.) The same letter goes on to "respectfully remind" KI that "user rights for the CAMPUS product line, as well as the developed production methods and/or mechanisms . . . are part of the copyright/pattern protection of Studio De Lucchi" [S&P's predeccessor]. (Am. Compl., Ex. Q.) However, the citation to Exhibit Q in the Amended Complaint serves solely as support for the allegation that KI and S&P held meetings together in 1995. (Am. Compl. ¶ 32.) Another letter in Exhibit Q confirms the date of one such meeting. There is no further reference to Exhibit Q in the underlying complaints, none to the letter KI now cites to in its brief, and no allegation that KI engaged in the unauthorized use of the "PR material" referenced therein.

S&P's allegation that KI displayed the CAMPUS furniture in its showroom without authorization does not amount to a claim KI improperly used S&P advertising materials. As an initial matter, KI's display of the furniture in 1995 is cited in the amended complaint as evidence that KI affirmatively misrepresented its intentions with regard to the furniture design when it told S&P it was no longer interested in selling the CAMPUS furniture, even as it continued to display it for sale. *Studio & Partners v. KI*, No. 06-C-0628, Am. Compl. ¶ 32 ("As part of the scheme to defraud and mislead S&P . . . . Mr. Jeska [a KI employee] represented to Mr. Fritze [an employee of S&P] that KI would not be going forward with selling the CAMPUS line of furniture. . . .[A]t the time Mr. Jeska made these representations, KI had actually intended to sell the CAMPUS line of products, as, at that time, the CAMPUS desk and chair were both displayed in KI's showroom where customers were brought in at least monthly to see what they wanted to buy.")). It is not alleged as part of a claim that KI somehow misappropriated S&P's advertising materials.

Indeed, there is no suggestion in either S&P's original or amended complaint that the CAMPUS desk and chair that KI allegedly displayed in its showroom in 1995 were created by S&P for purposes of advertising. To the contrary, S&P indicated in its original complaint that it developed prototypes of the CAMPUS furniture "[a]s part of its design process." (*Studio & Partners v. KI*, No. 06-C-0628, Dkt. # 1, Compl. at ¶ 11.) Thus, the force of KI's argument that its alleged display of the CAMPUS furniture in its showroom was an alleged unauthorized use of "advertising materials," as with KI's broader claim that the CAMPUS design itself was a form of advertising idea or style, turns on whether the unique aesthetic design of the furniture may be

14

considered in and of itself to be an advertising idea or material, such that its unauthorized use or display would constitute advertising injury under the relevant policy language.[6]

KI notes that "S&P's legal claims for misappropriation and unjust enrichment involved the taking and use of S&P's Designs," (KI's Br. Supp. Mot. Summ. J. at 19) and that "how CAMPUS looked was what allegedly made the S&P's Designs innovative and award winning." (*Id.* at 20.) "Appearance being the selling factor," KI argues, the Court should "construe S&P's all-encompassing Design Rights to include an advertising idea, material, style, or title." (*Id.*) In other words, KI contends, "[a]ll copying and displaying of S&P's aesthetically innovative 'award winning style,' necessarily included the unauthorized use of S&P's advertising idea, material, slogan, style, or title." (*Id.* at 24; *see also id.* at 25 ("S&P created its designs to appeal to the next generation of school furniture buyers; this should be construed as an advertising idea as much as a new furniture idea.")) Thus, KI argues, Counts IV and V of S&P's complaint, which asserted claims for misappropriation and unjust enrichment, constitute advertising injury offenses. *(Id.* at 25.)

I reject KI's suggestion that the product itself, by virtue of its design, constitutes "advertising." Of course all products are, by their very nature, designed to attract customers. A product's quality, looks, and overall desirability are, it might be said, the best form of advertising.

---

[6] The parties also dispute whether, even if it otherwise constituted an enumerated offense, KI's alleged display of CAMPUS furniture could possibly give rise to a duty to defend under the advertising injury provision of the policies, which limits coverage to liability arising "from the advertising of your products, work or completed work." KI argues that under the definition of "your work" set forth in a separate policy provision limiting coverage of claims arising out of "your [the insured's] completed work," the CAMPUS furniture was KI's work, because S&P provided the furniture to KI, and "your work" includes "work others are performing for you" as well as "equipment, materials or parts provided with or for your work." (KI's Br. Supp. Mot. Summ J. at 22, citing KI's PFOF ¶¶ 30, 33.) Because I conclude that the furniture on display was not an advertising idea or material, I need not reach this issue.

But examination of that statement reveals it to be an oversimplification. It is not the product *per se* that is the advertising, because even the best product can lie dormant in a forgotten cellar somewhere and no one would say its intrinsic qualities alone had "advertised" it. Instead, advertising is communication *about* a product, and as such it cannot logically be the product *itself*. This distinction is implicit in St. Paul's definition: "Advertising means attracting the attention of others [to the product] by any means for the purpose of seeking customers or increasing sales or business." The advertising – the means or act of attracting attention – needs an object; it is not *itself* the object.

Numerous courts have reached the conclusion that the product itself is not advertising. *Westport Reinsurance Management, LLC v. St. Paul Fire & Marine Ins. Co.,* 80 Fed. Appx. 277, 279, 2003 WL 22594407, 2 (3d Cir. 2003) (product itself is not advertising); *Green Mach. Corp. v. Zurich-American Ins. Group,* 313 F.3d 837, 841 (3d Cir. 2002) ("Chiuminatta alleges not that Green Machine copied its marketing strategy or style of attracting customers, but that Green Machine copied its patented method for cutting concrete in order to sell its own saws . . . . These allegations do not state a claim for misappropriation of Chiuminatta's marketing style used to sell its concrete-cutting method, but rather for theft of the underlying method itself."); *Accessories Biz, Inc. v. Linda and Jay Keane, Inc.,* 533 F. Supp.2d 381, 388 (S.D.N.Y. 2008) ("L & J argues that the Samples themselves are a form of advertising, but New York courts have routinely held that the phrase "advertising idea" does not include the product itself."); *Hosel & Anderson, Inc. v. ZV II, Inc.,* 2001 WL 392229, *2 (S.D.N.Y. 2001) ("[t]he product itself is not an advertisement within the meaning of the policy"). I reach the same conclusion here. S&P's claim was that KI stole S&P's

16

furniture design and advertised the resulting product; S&P did not claim that KI stole S&P's "advertising idea, material, slogan, style or title . . . ."

In KI's view, this case is "largely governed" by the Wisconsin Supreme Court decision in *Fireman's Fund v. Bradley Corp.* (KI's Br. Supp. Mot. Summ. J. 16.) In *Bradley,* however, the Court was addressing different policy language that expressly covered trademark infringement, which the parties agreed included trade dress infringement. 660 N.W.2d at ¶ 28. None of the St. Paul policies define advertising injury to include trademark infringement. Moreover, the *Bradley* Court found advertising injury was alleged in the complaint because count VII alleged violations of the Lanham Act. The Lanham Act, the court noted, was designed to remedy unfair competition stemming from false designation of origin, and key to the considerations involved in such a claim was whether there was a likelihood of consumer confusion. Because consumer confusion arises only through false *advertising* about the origin of the product, the court found that claim had alleged advertising injury. Similarly, the court found the required causal nexus between the advertising activities and the advertising injury. The complaint alleged injury not just from the *theft* of the design, but from the consumer confusion alleged in count VII. That was an additional injury pled in the complaint, and it was due to the defendant's advertising activities. "Our inquiry is whether, based on the allegations in the complaint, Bradley's advertising of products contributed to the alleged injury of consumer confusion suffered by Lawler." 660 N.W.2d at 681-82.

Similarly, the Wisconsin Court of Appeals applied *Bradley* in another advertising injury case involving the same policy language found in Bradley. It found a duty to defend because the complaint (like the one in *Bradley*) alleged a claim relating to consumer confusion:

17

Here, the complaint alleges that Super Natural, "an authorized distributor," presented Xenidrine to the trade under circumstances that allegedly created a mistaken impression about the origin of the product and that this presentation was likely to "cause confusion, or to cause mistake, mislead the trade and public."

We conclude that it is reasonable to infer-based upon the allegations that Super Natural presented Xenidrine to the trade under circumstances that allegedly created a mistaken impression about the origin of the product-that these advertising activities contributed to the alleged injuries of confusion, mistake and a misleading of the trade and public.

*Indiana Ins. Co. v. Super Natural Distributors, Inc.,* 2003 WI App 244, 2003 WL 22336427, *10 (Wis. Ct. App. 2003); *see also Superformance Intern., Inc. v. Hartford Cas. Ins. Co.,* 203 F. Supp. 2d 587, 597 (E.D.Va. 2002) (finding duty to defend because complaints alleged defendant "intended to cause, has caused and is likely to continue to cause confusion. . . .")

The most recent Wisconsin Supreme Court case on advertising injury also demonstrates how the injury alleged must truly be based on advertising to potential customers. In *Acuity Mut. Ins. Co. v. Bagadia,* the court found a duty to defend and indemnify based on the insurer's advertising injury coverage. 2008 WI 62, 750 N.W.2d 817 (Wis. 2008). The court first found, again unlike this case, that the plaintiff's trademark infringement claim was an enumerated offense under the "advertising injury" clause of the policy. It further found the defendant had engaged in advertising activity by sending samples of the trademarked and copyrighted product to potential customers. Finally, the court found the requisite causal nexus between the injury and the advertising activity: "[a]dvertising likely materially contributed to consumer confusion." 750 N.W.2d at 831, 2008 WI 62, ¶ 58. That is, the sending of the plaintiff's copyrighted software caused consumer confusion as well as damages suffered by the plaintiff.

The underlying action here, by contrast, contains no allegation of such advertising injury. The amended complaint states claims for fraudulent concealment, breach of fiduciary duty,

18

correction of patent inventorship, misappropriation, unjust enrichment, and misrepresentation / fraud / negligent / strict liability. These claims allege: KI had a duty to disclose to S&P that it was using its designs; KI breached its fiduciary duties to S&P; KI defrauded the patent office; KI misappropriated S&P's design; KI unfairly retained a benefit from use of S&P's design; and KI misrepresented to S&P that KI was not interested in pursuing the design. Importantly, none of these claims involve advertising at all. In *Bradley,* there was one claim predicated on consumer confusion, and because consumers are principally reached through advertising it made sense to find an allegation of injury based on advertising. Similarly, in *Bagadia,* the court found that the sending of the copyrighted software samples and advertising of trademarked software was part and parcel of the injury alleged. Here, however, none of the claims in the Underlying Action relate in any way to advertising of the product. There is no injury alleged based on consumer confusion or any advertising of the product. Indeed, unlike the plaintiffs in *Bradley* and *Bagadia*, S&P wasn't KI's competitor seeking damages for loss of its own sales; as far as appears from the complaint, S&P had never developed or sold any of the furniture itself. Instead, S&P was seeking a share of KI's profits based on KI's alleged misappropriation of S&P's design.

KI cites several portions of the complaint which refer to displaying or advertising the products, but, as noted above, those sections are essentially surplusage. These citations within the complaint are not a component of any injury (since they do not relate to the merits of any of the claims), but rather are offered as simply background material or evidence. Indeed, the consumer (the target of any advertising activity) is not even in the picture because five of the claims relate solely to the relationship between S&P and KI, while the other claim is based on representations KI made to the patent office, which is not advertising. The fact is that even if S&P had won on the

19

merits of each one of its claims, none of its proven injuries would have anything whatsoever to do with advertising.

*Bradley* and the other cases cited above stand for the simple principle that the inquiry is "whether, based on the allegations in the complaint, [the defendant's] advertising of products contributed to the alleged injury of [the plaintiff]." 660 N.W.2d at 681-82. When the complaint alleges injury based on consumer confusion (e.g., trade dress or trademark infringement or a Lanham Act violation) the complaint likely alleges advertising injury. But when the injuries alleged do not relate to advertising at all, there is no advertising injury and of course no causal connection between any advertising activity and injuries remediable by the claims alleged. This is not a novel principle, of course. Applying California law, the Ninth Circuit reached the same conclusion: "[a]ppellants produced no evidence on summary judgment that Reddi-Made had suffered damages because of their advertising in order to prove the elements of any such claim. Thus, the appellants' argument utterly fails to address the correct causation requirement under the language of the policy and California law." *Simply Fresh Fruit, Inc. v. Continental Ins. Co.,* 94 F.3d 1219, 1222 (9th Cir. 1996). Citing a number of other cases, the Tenth Circuit summarized these principles aptly:

> The mere fact that SuperVision was advertised or distributed at some point in time is not sufficient to transform Burson's ownership infringement claims into advertising injury. *See Novell,* 141 F.3d at 988 ("The fact [the insured] may have advertised the competing product to consumers simply did not cause [the underlying plaintiff's] injuries"); *see also Microtec Research, Inc. v. Nationwide Mut. Ins. Co.*, 40 F.3d 968, 971 (9th Cir.1994) ( "If the [insured] does some wrongful act and then advertises it, harm caused by the wrongful act alone is not within the scope of the term advertising injury."); *Farmington,* 996 F. Supp. at 702 (holding that causal connection between alleged injuries and advertising activity cannot be satisfied by "a mere showing that the allegedly infringing product was advertised."). "Otherwise, advertising injury coverage would apply whenever an advertised product or service is alleged to have caused harm, rendering the coverage applicable with respect to most claims against an insured business." *Advance Watch Co., Ltd.*

20

*v. Kemper National Ins. Co.*, 99 F.3d 795, 806 (6th Cir.1996); *see also National Union Fire Ins. Co. v. Siliconix Inc.*, 729 F. Supp. 77, 80 (N.D.Ca.1989) ("Taken to its extreme, this argument would lead to the conclusion that any harmful act, if it were advertised in some way, would fall under the grant of coverage merely because it was advertised. Under this rationale, for instance, injury due to a defective product which is sold as a result of advertising activity and which later harms a consumer, may fall within the coverage grant. . . . Thus, a great many acts may fall within the ambit of advertising, extending injury coverage far beyond the reasonable expectations of the insured.").

*Idg, Inc. v. Continental Cas. Co.* 275 F.3d 916, 923 -924 (10th Cir. 2001).

In sum, the allegations in S&P's amended complaint fall within none of the enumerated advertising injury offenses listed in St. Paul's policies. Unlike the policies at issue in *Bradley* and *Bagadia,* St. Paul's policies did not include trademark infringement as a covered offense, and there is no allegation that KI stole S&P's advertising idea, material, slogan, style or title. Furthermore, there was no allegation that S&P sustained any injury as a result of KI's advertising in the underlying action. S&P did not assert a claim whose success or failure depended in some way on advertising (even in its broad definition). Unlike the complaints in *Bradley* and *Bagadia*, S&P's complaint failed to allege a single claim relating to advertising. Because S&P never alleged advertising injury, there is no duty to defend.


**B. Advertising Injury Coverage Under Federal's Policies**

For essentially the same reasons, KI's claim that Federal had a duty to defend the underlying action under its policies also fails. First, S&P's amended complaint did not allege any claim that falls within the advertising injury offenses enumerated in Federal's policies. KI contends that S&P's allegations that KI misappropriated the CAMPUS furniture design fall within the enumerated advertising injury offenses in Federal's policies, as allegations of "infringement of copyrighted

21

advertising materials" committed in the course of KI's advertising of its own furniture line. (KI's

Br. Supp. Mot. Summ. J. 28-29.) As evidence that such a copyright infringement claim, while not

explicitly listed by S&P, was nonetheless sketched by S&P's factual allegations, KI cites to a letter

from S&P to KI, attached to the Amended Complaint as Exhibit Q, which states,

> [W]e repeat our request to send us all PR material, photos (Herman Agency), as well
> as all manufacturing drafts concerning the CAMPUS product line.
>
> We also respectfully remind you that user rights for the CAMPUS product line, as
> well as the developed production methods and/or mechanisms (PV edge, adjustment
> mechanism for table, pencil holder in edge, etc.) are part of the copyright/pattern
> protection of Studio De Lucchi. The use of any of these components is possible only
> after explicit written authorization by us.

(Am. Compl, Ex. Q at SP0001648.) Mere mention of the word "copyright" in an attached exhibit,

however, is not sufficient to give rise to a claim within the advertising injury coverage of Federal's

policy. Indeed, Federal's policies expressly excluded claims for copyright infringement, "other than

infringement of copyrighted advertising materials." (Federal's PFOF ¶ 5.) Nothing in the quoted

letter, or the amended complaint to which it was attached, suggests that S&P was accusing KI of

infringing on S&P's copyrighted advertising materials in the course of KI's advertising its own

goods. What the letter suggests is that S&P claimed copyright protection of its furniture design or

pattern, not that its advertising materials were copyrighted.

Moreover, even if the complaint in the underlying action could be read to allege copyright

or trademark infringement based on KI's alleged misappropriation of S&P's furniture designs, there

is certainly no allegation that KI made infringing use of copyrighted *advertising* materials, unless

one regards the design itself as advertising, an argument that I have already fully addressed and

rejected above. For the same reasons, I now conclude that none of the claims asserted by S&P fall

within the advertising offenses enumerated in Federal's policies.

22

Finally, also for the reasons noted above, KI's claim against Federal fails because there is no allegation in the underlying action that S&P sustained any injury as a result of KI's advertising of its products. Unlike *Bradley* and *Bagadia*, this was not a case in which one of the insured's competitors was claiming it was harmed by the consumer confusion created by the insured's advertising. S&P never claimed it was KI's advertising that caused it injury; instead, S&P claimed it was entitled to a share of KI's profits because KI misappropriated its furniture design. The only role KI's advertising could have conceivably played was to increase the profits KI likely received on its sales of the furniture. S&P sought a share of KI's profits because it claimed KI had stolen its design, not because it thought KI had stolen its advertising. It was KI's failure to account to S&P for the profits it received from S&P's design, not KI's advertising, that S&P claimed entitled it to an award of damages. This is not advertising injury within the meaning of Federal's policies. I therefore conclude that Federal, like St. Paul, had no duty to defend KI in the underlying action.

## II.  Reimbursement of Defense Fees

There remains the issue of St. Paul's request for reimbursement of its expenditures in defending KI in the Underlying Action. St. Paul has argued that because it accepted KI's tender of defense pursuant to a reservation of rights and expressly reserved its right to seek reimbursement, it would be entitled to recover the amount of attorneys fees and costs that it paid on KI's behalf in the underlying action in the event it was determined it had no duty to defend. Since the Court has now determined that St. Paul did not owe KI such a duty, its claim for reimbursement is properly before me.

This is no small matter. As of April, St. Paul claimed it had paid KI more than $708,000 in fees and expenses. (Doc. # 53, St. Paul Br. Supp. Mot. S.J. at 20.) In addition, St. Paul now

23

seeks leave to file an amended counterclaim in which it seeks reimbursement of an additional $315,000 it paid S&P to settle the case while the appeal from this Court's dismissal of the underlying action was pending. (Doc. #91.) Surprisingly, despite the magnitude of its claim against KI, St. Paul does not identify either in its original counterclaim, or in its proposed amended counterclaim, the legal theory which it believes entitles it to such relief. KI suggests that St. Paul's counterclaim should be dismissed for this reason alone. (KI Br. Opp. S.J. at 26.)

The minimum requirements for properly stating a claim in federal court are not difficult. All that's required is "a short statement, in plain (that is, ordinary, nonlegalistic) English, of the legal claim." *Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1041 (7th Cir. 1999) (citing Fed. R. Civ. P. 8(a)). Even under this standard, however, the sufficiency of St. Paul's original counterclaim is questionable. The problem isn't that the counterclaim fails to identify the legal theory under which reimbursement of its defense costs is sought, or even that it fails to set forth in detail the factual basis for its claim. The Seventh Circuit has consistently reminded parties asserting claims that "they don't have to file long complaints, don't have to plead facts, don't have to plead legal theories." *Id.* The problem with St. Paul's original counterclaim is that it appears to seek only declaratory relief. St. Paul's original counterclaim, which is included with its Answer, is entitled "Counterclaim for Declaratory Judgment." (Doc. # 15.) The only mention of reimbursement is in paragraph 26, which alleges: "The Policies, even where applicable, do not obligate St. Paul to pay more than is reasonable and necessary in defense of a claim, do not obligate St. Paul to pay pre-tender costs or fees and do not bar St. Paul from seeking reimbursement for fees and costs extended where there is no coverage." (Doc. # 15, ¶ 26.) While the *ad damnum* clause includes, in addition to a request for a declaration that the policies do not provide coverage for the underlying complaint,

24

a request for "costs, disbursements and attorneys fees as provided by law," there is no indication as to which case – the underlying action or the declaratory judgment action – the requested costs, disbursements and attorneys fees are for. There is no demand for reimbursement of defense costs already expended on behalf of KI in the underlying action.[7] (*Id.*) If this were the only pleading before the Court, it would be difficult to conclude that St. Paul had asserted a claim for reimbursement.

As noted above, however, St. Paul has also filed a motion for leave to file an amended counterclaim. The amended counterclaim appears to cure the defect in the original counterclaim at least to the extent that it specifically sets forth a claim for "reimbursement of amounts paid in defense of the claims in the Underlying Complaint and for amounts paid in settlement of the claims in the Underlying Complaint." (Doc. # 92 at 5.) Since a motion to amend pleadings is to be liberally granted when justice so requires, Fed. R. Civ. P. 15(a)(2), and there is no reason to believe that St. Paul has been dilatory or that KI would be prejudiced, it would appear that St. Paul's motion should be granted unless the amendment would be futile. *Chavez v. Illinois State Police*, 251 F.3d 612, 632 (7th Cir. 2001). Based upon my review of the parties' respective briefs on the issue, I do not find the proposed amendment futile. Indeed, I am satisfied that under the circumstances of this case St. Paul's claim for reimbursement is not frivolous.

Although St. Paul has not specified the nature of its claim for reimbursement, the undisputed facts before the Court suggest that the relief it is seeking is equitable rather than legal in nature. The

---

[7] Presumably, the reason St. Paul did not set forth a more detailed claim is that at the time it filed its counterclaim it had not yet paid KI any of its defense costs. St. Paul filed its original counterclaim on August 30, 2007, but did not tender funds to KI in payment of KI's defense cost in the underlying action until November 2007. (Doc. # 15; Doc. # 81, KI Br. Opp. S.J. at 27.)

issue of reimbursement is not addressed in the policies and, while St. Paul stated expressly in its letter accepting KI's tender of its defense that it intended to seek reimbursement in the event it prevailed on its coverage defense, KI did not agree to such a condition and denied St. Paul would be entitled to reimbursement. Thus, St. Paul has no contractual right to reimbursement. Wisconsin does recognize, however, a claim for unjust enrichment. To demonstrate unjust enrichment, a party must show: (1) a benefit conferred upon the defendant by the plaintiff, (2) knowledge or appreciation of the benefit by the defendant, and (3) acceptance and retention by the defendant of such benefit under such circumstances that it would be inequitable for him or her to retain it without paying the value thereof. *Ludyjan v. Continental Cas. Co.*, 2008 WI App 41, ¶ 7, 308 Wis.2d 398, 405, 747 N.W.2d 745, 748 (Wis. Ct. App. 2008). In essence, this seems to be what St. Paul is claiming here. By paying more than $708,000 of KI's costs to defend and $315,000 to settle a lawsuit the Court has now concluded it had no legal obligation to defend, St. Paul has clearly conferred a benefit on KI. While KI may disagree with the conclusion that St. Paul had no duty to defend it, it was clearly aware of the benefit St. Paul's payment conferred upon it. The critical question is whether it would be inequitable for KI to retain the benefit conferred upon it now that the Court has determined St. Paul had no legal obligation to pay.

A survey of Wisconsin law on the issue makes clear why an insurer like St. Paul would choose to pay for its insured's defense in a lawsuit even though it in good faith believes it has no obligation under its policy to do so. As the Wisconsin Court of Appeals recently observed,

> An insurer believing that its policy does not indemnify against a particular claim has several options for preserving its rights without violating its duty to defend. . . . . It may seek a judicial resolution of coverage before the underlying claim is tried, or it may defend its insured under a reservation of rights. . . . . The insurer may, on the other hand, simply refuse to assist and leave the insured to his or her own defense.

26

> If the insurer is correct that it owes no duty to defend, then it suffers no negative consequences of this action. . . . . However, the insurer should be very wary of taking this route, because if it is later found that the insurer did have a duty to defend, the breach of that duty estops the insurer from contesting coverage in the underlying action. . . . . This means that it must pay, in addition to the insured's cost to defend the underlying action, any damages awarded in that action.

*Liebovich v. Minnesota Ins. Co.*, 2007 WI App 28, ¶ 4, 299 Wis.2d 331, 728 N.W.2d 357. In some cases, insurers who have breached their duty to defend have been held liable not only for the fees expended in defense of the underlying action, but also for the fees expended by their insured in establishing coverage. *Elliott v. Donahue*, 169 Wis.2d 310, 320-21, 485 N.W.2d 403 (1992). Where the case proceeds to judgment, the insurer may be found liable for the full amount of the award, regardless of the policy limits. *Newhouse v. Citizens Sec. Mut. Ins. Co.*, 176 Wis.2d 824, 838, 501 N.W.2d 1 (1993). And, of course, if the insurer's denial of coverage is later found to have been in bad faith, it can be held liable for punitive damages, as well. *Alt v. American Family Mut. Ins. Co.*, 71 Wis.2d 340, 348, 237 N.W.2d 706 (1976). Faced with the risk of such additional liability if its decision turns out to be wrong, many insurers elect to defend under a reservation of rights even when they think no covered claim has been asserted. The question raised here is whether, when an insurer does so and is later found not to have owed a defense, it can recover the costs of the defense it provided to its insured.

The Wisconsin courts have not directly addressed the issue. KI contends, however, that the Wisconsin Supreme Court implicitly rejected such a claim by an insurer in *Mowry v. Badger State Mut. Cas.*, 129 Wis. 2d 496, 385 N.W.2d 171 (1986), and its progeny. In *Mowry*, which involved an automobile liability policy, the Court endorsed the practice of bifurcating the coverage issue and resolving it before turning to the issues of liability and damages in the underlying action. *Mowry*

27

recognized that where the coverage question is not resolved early, the insurer may be required to provide its insured a defense in order to avoid the risk of excess liability:

> An insurer may need to provide a defense to its insured when the separate trial on coverage does not precede the trial on liability and damages. Section 803.04(2)(b), Stats., states that the court upon ordering separate trials "shall specify in its order the sequence in which such trials shall be conducted." Thus, *we have noted that an insurer may be required to furnish a free defense to its insured prior to the determination of coverage.*

129 Wis. 2d 528-29 (italics added).

KI cites *Mowry*'s reference to a "free defense" in support of its argument that the Wisconsin Supreme Court has implicitly rejected an insurer's claim for reimbursement of defense costs paid under a reservation of rights. KI notes that in subsequent cases the Court has reaffirmed *Mowry* and made clear that in order to avoid a breach of its duty to defend, should it later be determined that a covered claim was alleged, the insurer must obtain a stay of the underlying action so that its insured is not forced to retain his own attorney. *Reid v. Benz*, 2001 WI 106, ¶ 22, 245 Wis.2d 658, 629 N.W.2d 262. Since St. Paul did not follow that procedure here, and instead refused KI's initial tender of its defense, KI argues that "St. Paul cannot possibly argue that it is entitled to reimbursement under Wisconsin law . . . ." (KI Br. Opp. S.J. at 25.)

Only by ignoring context can the Wisconsin Supreme Court's reference in *Mowry* to a "free defense" be taken as that Court's resolution of this important issue. In *Mowry*, the Court found that although the insurer actually owed its insured a defense, no defense costs were incurred in the underlying action until after the coverage issue was determined. 129 Wis. 2d at 528. The issue of whether the insurer was entitled to reimbursement never arose and, thus, the reference to a "free defense" must be taken as *dicta*. Moreover, *Mowry* envisioned coverage questions that could be

28

easily and quickly resolved before substantial defense costs in the underlying action would be incurred, and it directed trial courts to expedite their resolution of the coverage question once bifurcation was ordered:

> It would seem that, once an order to bifurcate has been made, a trial on a coverage issue should be a relatively simple matter. We, therefore, encourage a court which has ordered bifurcation to expedite the coverage issue by placing the trial on its calendar at an early date to assist in avoiding a needlessly protracted claim against the insured.

129 Wis. 2d at 529 n. 4; *see also Reid*, 245 Wis. 2d at ¶ 27. Assuming that a liability insurer under an auto or homeowner's policy would swallow the costs of defending its insured for the brief period of time needed to preserve his rights before a stay was obtained and the coverage issue resolved is far different from holding that a liability carrier for a large commercial concern has no recourse when it has expended more than $708,000 in defense of a claim for which it provided no coverage and owed no duty to defend.

As this case suggests, the assumption underlying *Mowry* and its progeny that in most cases coverage issues could be easily and expeditiously resolved before addressing liability and damages on the underlying claim has proven not to be true. Often coverage questions, especially those arising under comprehensive general liability policies in complex commercial litigation, are not easily resolved without substantial discovery of the merits. *See, e.g., Stuart v. Weisflog's Showroom Gallery, Inc.*, 2008 WI 86, __ Wis. 2d ___, 753 N.W.2d 448. To stay all proceedings on the underlying claim until the coverage question is resolved will often indefinitely delay the plaintiff's case and risk prejudice as memories fade and potential evidence is lost. Bifurcation and stay of liability issues can also give rise to unproductive disputes over the scope of the discovery allowed and lead to multiple depositions of the same witnesses, thereby increasing the time and expense

29

required for both the parties and the court. *See Estate of Watts v. Heine*, 2008 WL 4056317 (E.D. Wis. August 25, 2008) (denying insurer's motion to bifurcate and stay on finding that determining coverage issue through a separate proceeding will delay the ultimate resolution of the case and generate greater cost for the primary parties). Moreover, even in cases where the trial court grants the insurer's motion to bifurcate and resolves the coverage question expeditiously in favor of the insured, that does not end the matter if the insured elects to appeal. In order to preserve its rights and avoid excess liability, the Wisconsin Supreme Court has held that the insurer must continue to defend its insured in the trial court while the appeal is pending. Otherwise, if it turns out that the trial court was in error, the insurer can be held liable not only for its insured's attorneys fees, but for the full amount of the judgment entered against him, regardless of any policy exclusions or the policy limits. *Newhouse v. Citizens Sec. Mut. Ins. Co.*, 176 Wis.2d at 836 ("When an insurer relies on a lower court ruling that it has no duty to defend, it takes the risk that the ruling will be reversed on appeal."). It is thus clear that in many cases the option of defending under a reservation of rights, and seeking bifurcation and an immediate stay of the principal action until the coverage issue is resolved, will not protect an insurer defending under a reservation of rights from incurring substantial defense costs despite the fact that it may later be found to owe no duty to defend its insured in the underlying action.

Neither *Mowry*, nor any other case cited by the parties holds that an insurer who incurs such costs and is later found to have had no duty to defend under its policy, cannot sue for reimbursement. This Court's task then is to predict how the Wisconsin Supreme Court would decide the question. *Taco Bell Corp. v. Continental Cas. Co.*, 388 F.3d 1069, 1077 (7th Cir. 2004) ("The duty of a federal court in a diversity suit is to predict what the state's highest court would do

30

if presented with the identical issue.").  In order to do so, it is useful to consider how other courts

have addressed the issue.

Other courts are divided as to whether a reimbursement of defense costs is allowed under

these circumstances.

> The majority position permits an insurer to seek reimbursement for defense costs
> when it is determined the insurer has no duty to defend or indemnify, the policy does
> not contain an express provision regarding reimbursement, and the insurer timely
> reserves its right to reimbursement in a specific and adequate notice. *See, e.g.,
> United Nat'l Ins. Co. v. SST Fitness Corp.*, 309 F.3d 914, 916 (6th Cir. 2002)
> (predicting Ohio law). The minority position limits an insurer's right to
> reimbursement to those situations where there is an express provision in the policy
> providing for reimbursement. *See, e.g., General Agents Ins. Co. of Am. Inc. v.
> Midwest Sporting Goods, Co.*, 215 Ill. 2d 146, 293 Ill. Dec. 594, 828 N.E.2d 1092,
> 1094 (2005).

*Cincinnati Ins. Co. v. Grand Pointe, LLC*,  501 F. Supp. 2d 1145, 1161 (E.D. Tenn. 2007); *see

generally* Douglas R. Richmond, *Reimbursing Insurers' Defense Costs: Restitution and Mixed

Actions*, 35 San Diego L. Rev. 457, 499 (1998).  The majority position is also reflected in a tentative

draft of the Restatement:

> If one party to a contract demands from the other a performance that is not in fact
> due by the terms of their agreement, the party on whom the demand is made may
> render such performance under protest or with reservation of rights, preserving a
> claim in restitution to recover the value of the benefit conferred in excess of the
> recipient's contractual entitlement.

*Restatement (Third) of Restitution & Unjust Enrichment* § 35(1) (T.D. No. 3, 2004).

Citing the decision of the California Supreme Court in *Buss v. Superior Court of Los

Angeles*, 939 P.2d 766 (Cal. 1997), St. Paul urges the Court to predict Wisconsin would follow the

majority rule.  The *Buss* Court concluded that an insurer has an implied right to reimbursement of

defense costs as to claims not even potentially covered by a policy, because the insurer has no

31

contractual duty to defend such claims, and has not bargained to bear such costs. *Id*. at 776-777; *see also General Agents Ins. Co. of America, Inc. v. Midwest Sporting Goods Co.*, 828 N.E.2d 1092, 1101 (Ill. 2005) ("In general then, the decisions finding that an insurer is entitled to reimbursement of defense costs are based upon a finding that there was a contract implied in fact or law, or a finding that the insured was unjustly enriched . . . .").[8] Concerning public policy, the *Buss* Court noted that "[w]ithout a right of reimbursement, an insurer might be tempted to refuse to defend an action in any part—especially an action with many claims that are not even potentially covered and only a few that are—lest the insurer give, and the insured get, more than they agreed." 939 P.2d at 778.

In contrast, the minority position refuses to permit an insurer to recover defense costs pursuant to a reservation of rights absent an express provision to that effect in the insurance contract between the parties. Explaining this perspective, the Illinois Supreme Court has stated,

> [a]s a matter of public policy, we cannot condone an arrangement where an insurer can unilaterally modify its contract, through a reservation of rights, to allow for reimbursement of defense costs in the event a court later finds that the insurer owes no duty to defend. . . . [R]ecognizing [] an implied agreement effectively places the insured in the position of making a Hobson's choice between accepting the insurer's additional conditions on its defense or losing its right to a defense from the insurer.

*General Agents*, 828 N.E.2d at 1102. The Third Circuit Court of Appeals in *Terra Nova Insurance Co. v. 900 Bar, Inc.*, similarly reasoned,

---

[8] In *Buss*, the court found that even though the law imposes a duty to defend against all claims in an action where any one claim triggers the duty to defend, the duty is not contractual, and an insurer may later seek reimbursement of costs allocatable to the defense of claims that were not even potentially covered. 939 P.2d at 777. Here, of course, I have concluded that none of the claims asserted by S&P triggered a duty to defend. Therefore, I need not address under what circumstances, if any, the reimbursement of costs is available in a so-called "mixed" action in which some, but not all claims, at least arguably give rise to coverage.

32

A rule permitting such recovery would be inconsistent with the legal principles that induce an insurer's offer to defend under reservation of rights. Faced with uncertainty as to its duty to indemnify, an insurer offers a defense under reservation of rights to avoid the risks that an inept or lackadaisical defense of the underlying action may expose it to if it turns out there is a duty to indemnify. At the same time, the insurer wishes to preserve its right to contest the duty to indemnify if the defense is unsuccessful. Thus, such an offer is made at least as much for the insurer's own benefit as for the insured's. If the insurer could recover defense costs, the insured would be required to pay for the insurer's action in protecting itself against the estoppel to deny coverage that would be implied if it undertook the defense without reservation.

887 F.2d 1213, 1219-20 (3d Cir. 1989).

The rejoinder to that argument is that an insurer is hardly blameworthy for defending under a reservation of rights, given the potential liability it faces for breach of contract and (especially in this case) the uncertain nature of the advertising injury alleged. Moreover, allowing reimbursement encourages insurers to provide a defense, which expedites litigation and aids insureds, rather than opting to refuse coverage at the outset. It also leaves the insured in the same position it would have occupied had the insurer refused to provide a defense, as it was entitled to do, at the outset. Further, it avoids the situation that arises when an insurer seeks an unwieldy stay of the underlying action in order to obtain a coverage determination.

It is more than clear from the foregoing that St. Paul's claim for reimbursement is not frivolous and thus it would not be futile to grant St. Paul's motion for leave to file its amended counterclaim. Since leave to file the proposed counterclaim has not yet been granted, however, and KI has yet to file its reply, I decline to proceed to a final decision on this important issue at this time. Given the questionable sufficiency of St. Paul's original counterclaim, I conclude it would be more prudent to await the filing of the amended counterclaim, allow KI to file a reply, and consider any additional argument the parties may wish to present before deciding whether St. Paul is entitled to

reimbursement of its defense costs, as well as the $315,000 it paid S&P in settlement of the claim on appeal. Accordingly, St. Paul's motion for summary judgment on its claim for reimbursement is denied without prejudice as premature.

## CONCLUSION

For the reasons stated above, I conclude that neither St. Paul nor Federal had a duty to defend KI in the Underlying Action. KI's motion for partial summary judgment (Doc. # 63) is therefore **DENIED**. Federal's motion for summary judgment (Doc. # 57) is **GRANTED**, as is St. Paul's (Doc. # 52), but only in part. St. Paul's motion is **DENIED** without prejudice as to its claim for reimbursement of its defense costs paid KI. In addition, St. Paul's motion for leave to file an amended counterclaim (Doc. # 91) is **GRANTED**. KI's motion for leave to file an amended complaint, which seeks to add claims against St. Paul for its alleged bad faith in responding to KI's demands for payment of all of its defense costs and asserting a right to reimbursement (Doc. # 94), is **DENIED**. It clearly follows from what has already been said that St. Paul did not act in bad faith since it owed KI no duty to defend and its claim for reimbursement is not frivolous. The Clerk is directed to set this matter on the Court's calendar for a Rule 16 telephone conference to address further scheduling.

Dated this ___19th___ day of November, 2008.

s/ William C. Griesbach
William C. Griesbach
United States District Judge